UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



ANN MUNIZ and ED MUNIZ and JOSEPH SHROKA )
and DIANE SHROKA, individually )
and on behalf of all others similarly situated, )
)
Plaintiffs, )
) No. 04 C 2405
v. )
) Judge John W. Darrah
REXNORD CORPORATION, et al., )
)
Defendants. )
_____ )
)
REXNORD CORPORATION, et al., )
)
Third-Party Plaintiffs, )
)
v. )
)
ARROW GEAR COMPANY, et al., )
)
Third-Party Defendants. )
_____ )
)
LOVEJOY, INC., )
)
Fourth-Party Plaintiff, )
)
v. )
)
CORNING INCORPORATED, )
)
Fourth-Party Defendant. )

## MEMORANDUM OPINION AND ORDER

Class Action Plaintiffs filed suit against Defendants, seeking recovery under Section 107 of the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended ("CERCLA"), and pendent claims under Illinois common law. In their Complaint, Muniz alleged

release of chemicals, including trichloroethylene ("TCE") and perchloroethylene ("PCE"), in and around the industrial facilities located in the Ellsworth Industrial Park in Downers Grove, IL. These chemicals subsequently migrated into the groundwater, were released in airborne vapor, and have contaminated the Muniz's property and water supply. Plaintiffs allege that Defendants' businesses operating within the Ellsworth Industrial Park are liable for these injuries.

Defendants filed third-party contribution claims against multiple Third-Party Defendants, all of whom also operate or operated facilities in the Ellsworth Industrial Park that allegedly generated and so disposed of the toxic chemicals. Third-Party Defendant, Lovejoy, Inc., subsequently filed a fourth-party contribution claim against Fourth-Party Defendant, Corning Incorporated.

Presently before the Court is Defendant Precision Brand Products, Inc.'s Motion for Judgment Denying Plaintiffs' Claim for Medical Monitoring pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56(b) and Local Rule 56.1(b).

## BACKGROUND

The Class Action Plaintiffs in this action are Ann Muniz, Ed Muniz, Joseph Shroka, and Diane Shroka. (Def.'s 56.1(a)(3) Statement ¶ 1). Each of the Plaintiffs have obtained the age of 21 since 1999 and have resided in their respective houses in the affected area since 1999. (Id., ¶¶ 6-8).

Precision Brands Products, Inc. and DuPage Manufacturing shared a building located at 2400 Curtiss Street within the Ellsworth Industrial Park from 1967 or 1968 until, approximately, 1979. (Def.'s 56.1(a)(3) Statement ¶ 26). DuPage Manufacturing used trichloroethylene ("TCE") and tetrachloroethylene ("TTCE") in its operations at 2400 Curtiss Street from approximately 1970 to 1979. (Id., ¶ 27). DuPage Manufacturing discontinued all operations in 1979 or 1980. (Id., ¶ 28). After DuPage Manufacturing discontinued operations in 1979 or 1980, DuPage Manufacturing's

assets were acquired by Precision. (Id., ¶ 29). Precision purchased certain assets and assumed certain liabilities of DuPage Manufacturing Company. (Plaints.' 56.1(b)(3) Statement ¶ 9).

In 2001, the Illinois Environmental Protection Agency, in conjunction with the Illinois Department of Public Health, tested private wells serving a number of homes in and near Downers Grove, Illinois, for the presence of volatile organic compounds. (Def.'s 56.1(a)(3) Statement ¶ 11). Plaintiffs' wells were included in the IEPA and IDPH testing. (Id., 12). Prior to October 1, 2001, Ann and Ed Muniz were informed, by telephone, of the results of the IEPA and IDPH's testing of their well. (Id., ¶ 13). Ann and Ed Muniz also received a letter dated September 28, 2001, from the IDPH, reporting, among other things, the results of the testing of their well. (Id., ¶ 14). Diane and Joseph Shroka were informed of the results of the testing of their well by a letter dated August 13, 2001. (Id., ¶ 15). Plaintiffs stopped drinking water from their well soon after being informed by the IDPH that solvents were found in their well. (Id., ¶ 17).

In August 2001 and December 2001, the IEPA posted "Fact Sheet # 1 " and "Fact Sheet # 3 " on its web site. (Def.'s 56.1(a)(3) Statement ¶ 21). In the August 2001 Fact Sheet, the IEPA stated that it did not have enough information to know the source of the contamination (Def.'s Exh. 7a). The December 2001 Fact Sheet did not identify any source of the contamination but did warn individuals that there were possible health effects of long-term use of well water with low levels of TCE and PCE, including a slightly increased cancer risk and impairments to immune system function or kidney or liver damage. (Def.'s Exh. 7b). In a letter dated December 6, 2001, five persons, including Ann Muniz, wrote to Thomas V. Skinner, the Director of the IEPA, seeking assistance to obtain safe water. The letter states that it appeared that the safety of their water was "questionable" for at least ten years and that the parties were told that the contamination was coming

from a local Downers Grove industrial park. (Def.'s 56.1(a)(3) Statement ¶ 20; Def.'s Exh. 9).

In December 2001, the *Downers Grove Sun* published an article concerning groundwater contamination in which Anne Muniz stated, "It's a health issue." (Def.'s Exh. 8a). In March 2001, an article in the *Downers Grove Sun* concerning the well-water contamination stated, "Muniz has entered into discussions with lawyers regarding the possibility of litigation." (Def.'s Exh. 8b). On June 5 and July 14, 2002, the *Chicago Tribune* published articles that discussed the contaminated wells but did not yet identify the source of the contamination. (Plaints' 56.1(b)(3) Statement ¶¶ 4-5). In August 2002, IEPA published Ellsworth Industrial Park Fact Sheet #4 addressing the contaminated wells. (Id., ¶ 6). Also in August 2002, the United States Environmental Protection Agency made available to the public for the first time the "Phase II, Site Assessment Report, Ellsworth Industrial Park, Downers Grove, DuPage County, Illinois." (Id., ¶ 7). On July 6, 2002, Ann Muniz retained counsel for purposes of filing a lawsuit for damages or injunctive relief relating to the contaminated groundwater. (Id., ¶ 8).

Until 2003, the water entering the plumbing system at Plaintiffs' residences was supplied by a single-home private well. (Def.'s 56.1(a)(3) Statement ¶ 9). In 2003, Plaintiffs' residences were connected to the Downers Grove municipal water supply. (Id., ¶ 10).

## ANALYSIS

Precision seeks summary judgment on Plaintiffs' claim for medical monitoring, contending that the claim is barred by the statute of limitations and that the claim is not legally cognizable.

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and

4

admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (*Celotex*). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001) (*Greer*).

Medical monitoring is a form of personal injury covered by the applicable Illinois two-year statute of limitations. *See* 735 ILCS 5/13-202; *Carey v. Kerr-McGee Chemical Corp.*, 999 F. Supp. 1109, 1120 (N.D. Ill. 1998) (*Carey*). The application of the statute of limitations generally involves a question of fact. However, the running of the statute of limitations can be decided by the court as a question of law when the existence of the bar is clear from the pleadings. *See Clay v. Kuhl*, 189 Ill. 2d 603, 609-10 (2000) (*Clay*).

Plaintiffs contend that their Complaint was timely filed under the discovery rule. Under the discovery rule, a cause of action accrues when the party knows or reasonably should have known of an injury and that the injury was wrongfully caused. *See Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 415 (1982) (*Knox*). "Injury," for purposes of the discovery rule, "denotes that damage has been done to one by another." *Roper v. Markle*, 59 Ill. App. 3d 706, 713 (1978) (*Roper*); *see also Hoffman v. Orthopedic Sys., Inc.*, 327 Ill. App. 3d 1004, 1010-11 (2002) (*Hoffman*) (plaintiff need not know the full extent of her injuries for statute of limitations to begin running); *Carey*, 999 F.

Supp. at 1120 (plaintiffs knew or should have known of injury – potential health hazards – from thorium tailings). "Wrongfully caused" does not mean that a plaintiff must have knowledge of the defendant's negligent conduct before the statute of limitations is triggered. *See Knox*, 88 Ill. 2d at 415. Instead, "[a]t some point the injured person becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved. At that point . . . the running of the limitations period commences." *Knox*, 88 Ill. 2d at 416; *see also Hoffman*, 327 Ill. App. 3d at 1010-11 (plaintiff need not know a specific defendant's negligent act for statute of limitations to begin running); *Roper*, 59 Ill. App. 3d at 710 ("statute begins to run when there is concurrence of the actual or constructive knowledge of both the physical problem and the possibility that someone is at fault for its existence.").

Plaintiffs filed suit on April 2, 2004. The undisputed facts here demonstrate that genuine issues of material fact exist as to whether Plaintiffs knew or reasonably should have known that they had been injured by wrongfully being exposed to PCE and/or TCE in the well water by April 2, 2002. While the Plaintiffs were informed in the Fall of 2001 that their well water tested positive for the presence of volatile organic compounds and that they should cease drinking the water because of *possible* adverse health effects, the extent of the contamination and, more importantly, the source of the contamination were not known until after April 2, 2002.

Precision cites to IEPA Fact Sheet # 3, dated December 2001, in support of its motion. However, that Fact Sheet merely notifies the public of the IEPA's preliminary investigation. The Fact Sheet states, in pertinent part, that the Illinois EPA was still gathering information from "several different areas in our investigation of potential sources of the solvent contamination," and that it had sent informational requests to "area businesses in and near the Ellsworth Industrial Park to learn

about previous and current solvent use and disposal." The Fact Sheet further warns that "[f]inding a potentially responsible party to past, non-reported environmental contamination usually takes a long time. In some cases, it is not possible to know with certainty the source of an old spill or release." Nowhere does the Fact Sheet disclose any actionable conduct or identify a responsible party. The December 20, 2001, *Downers Grove Sun* quoted Maggie Carson of the IEPA that "it was very important to find the source, but realistically that may not be possible." As late as June 5, 2002, a *Chicago Tribune* article stated that "[o]fficials have yet to find the source of the contamination near Downers Grove." Over a month later, on July 14, 2002, the *Chicago Tribune* quoted an EPA official as stating "[t]he data is just coming in . . . We have no conclusions yet."

It was not until August 2002 that the IEPA Fact Sheet # 4 identified the source area of the investigation as the Ellsworth Industrial Park. The Phase II report of the IEPA in August 2002, for the first time, made a preliminary conclusion as to the source of the contamination and identified Precision as one of the "Probable Source Facilities."

In support of its argument that the statute of limitations has run, Precision also refers to *Hoffman v. Orthopedic Sys., Inc.*, 327 Ill. App. 3d 1004, 1010-11 (2002) (*Hoffman*), and a March 2002 *Downers Grove Sun* article in which Ann Muniz reportedly entered into discussions with lawyers regarding possible litigation. However, unlike Ann Muniz, the *Hoffman* plaintiff had retained counsel, demonstrating that plaintiff was "on inquiry" as to her injury, thereby commencing the two-year limitation period. Accordingly, *Hoffman* is readily distinguishable from the instant case; Muniz retained counsel in July 2002.

It is noted that Plaintiffs contend that their medical monitoring claim is not barred by the statute of limitations because their claim is within two years of Defendants' tortious conduct. However, although not controlling here, for the reasons stated above, this theory would not avoid the application of the statute of limitations to bar Plaintiffs' claim. When a tort involves continuing or repeated conduct, the limitation period does not begin to run until the date of the last injury or when the tortious conduct ceased. *See Johnson v. Tipton*, 103 Ill. App. 3d 291, 300 (1982). A continuing tort "is occasioned by continuing unlawful acts and conduct." *Hyon Waste Mgmt. Serv., Inc. v. City of Chicago*, 214 Ill. App. 3d 757, 763 (1991) (*Hyon*). The continuing tort rule is generally applied to nuisance and trespass cases. *See, e.g., Meyers v. Kissner*, 149 Ill. 2d 1 (1992) (uninterrupted flooding of downstream landowner by upstream landowner). A continuing tort is distinguished from a continuing injury, or "continuing ill effects from an initial violation." *Hyon*, 214 Ill. App. 3d at 763. In the case of a continuing injury, a plaintiff's cause of action accrues when the effects of the injury first become known to the property owner, notwithstanding the fact that these effects are continuing. *See Powell v. City of Danville*, 253 Ill. App. 3d 667, 669 (1993) (*Powell*). In cases where the tortious activity ceased at a certain date, the courts have not applied the continuing tort theory because to do so would be "to confuse the concept of a continuing tort with that of a continuing injury." *Powell*, 253 Ill. App. 3d at 669. Put another way, a continuing tort "is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation." *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 278 (2003) (*Feltmeier*).

In *Powell*, the court held that the statute of limitations began to run at the time of the last tortious conduct – dumping toxic waste. The tortious act of dumping ended on a certain date; and while the effects may have continued because of leaching, the tortious act ceased when the dumping

8

ceased. The *Powell* court rejected the plaintiff's theory of continuing torts, finding that the theory conflicted with the "policy expressed by limitation provisions – that liability for past actions must end at some time." *Powell*, 253 Ill. App. 3d at 670. Similarly, in *Soo Line R.R. Co. v. Tang Indus.*, 998 F. Supp. 889, 897 (N.D. Ill. 1998) (*Soo Line*), the court held that since the tortious activity – dumping of toxic waste – ceased on a certain date, the continuing tort theory would not apply.

In the instant case, DuPage Manufacturing used (and allegedly dumped) TCE and PCE in its operations at 2400 Curtiss Street until 1979 or 1980. Plaintiffs contend that although the dumping of TCE and PCE ceased in 1979 or 1980, they were "subjected to continuing and repeated injury until 2003 " when they were connected to Lake Michigan water. Plaintiffs' argument is not one of continuing tort; instead, it is based on a continuing injury. Accordingly, Plaintiffs' cause of action accrued when the effects of the injury first became known to the property owner, notwithstanding the fact that these effects are continuing. *See Powell*, 253 Ill. App. 3d at 669; *Soo Line*, 998 F. Supp. at 897; *Feltmeier*, 207 Ill. 2d at 278; *cf. Leckrone v. City of Salem*, 152 Ill. App. 3d 126 (1987) (continuing tort theory applied where defendant *continued* to dump sewage into a stream, polluting that stream).

However, as discussed above, genuine issues of material fact exist as to when the source and effects of the injury first became known to the Plaintiffs; accordingly, Precision's Motion for Judgment as barred by the statute of limitations is denied.

Precision also argues that Plaintiffs' medical monitoring claim, without a present physical injury, is not cognizable under Illinois common law.

As part of their prayer for relief in Counts II through VIII, Plaintiffs seek a court-supervised fund to pay for medical monitoring. Precision argues that Illinois common law does not recognize a claim for medical monitoring because Plaintiffs have no present injury.

The Illinois Supreme Court has not decided whether a claim of medical monitoring is cognizable under Illinois common law. Consequently, the Court must predict how the Illinois Supreme Court would decide the issue. *See Mindgames, Inc. v. Western Pub'l Co.*, 218 F.3d 652, 655-56 (7th Cir. 2000).

Because diseases and injuries caused by the exposure of toxic substances are often latent, relief in the form of medical monitoring has developed as a means to compensate plaintiffs that have been wrongfully exposed to various toxic substances and require medical testing because of that exposure. *See In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 849-50 (3rd Cir. 1990) (*Paoli*); *Lewis v. Lead Indus. Assoc., Inc.*, 342 Ill. App. 3d 95, 101 (2003) (*Lewis*); *Carey*, 999 F. Supp. at 1118; *Allgood v. General Motors Corp.*, 2005 WL 2218371 (S.D. Ind. Sept. 12, 2005) (*Allgood*); *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 976-78 (Utah 1993) (*Hansen*). The latent nature of such diseases and injuries can present problems when the claims are analyzed under the traditional common law tort doctrine because, generally, a present injury needs to manifest before it is compensable. *See Paoli*, 916 F.2d at 850; *Lewis*, 342 Ill. App. 3d at 100-01. For example, in Illinois, an increased risk of future harm, without more, is insufficient to support an award of damages under the theories of strict liability, negligence, or willful and wanton misconduct. *See Dillon v. Evanston Hosp.*, 199 Ill. 2d 496-507 (2002) (*Dillon*).

However, that is not what is sought in this case. "There is a fundamental difference between a claim seeking damages for an increased risk of future harm and one which seeks compensation for

the cost of medical examination." *Lewis*, 342 Ill. App. 3d at 101. In a claim seeking damages for an increased risk of harm, the injury is the anticipated harm itself. To the contrary, here in their prayer for medical monitoring, the Plaintiffs are seeking damages, which are costs of the examination, for a medical examination to detect a possible physical injury. Contrary to a claim seeking damages for an anticipated increased risk of future harm, "a claim seeking damages for the costs of medical examinations is not speculative and the necessity for such examination is capable of proof within a reasonable degree of medical certainty." *Lewis*, 342 Ill. App. 3d at 101; *see also Carey*, 999 F. Supp. at 1119; *Paoli*, 916 F.2d at 851; *see also, Dillon*, 199 Ill. 2d at 497-504 ("a plaintiff must be permitted to recover for *all* demonstrated injuries"). The *Lewis* court explained:

> If a defendant's breach of duty makes it necessary for a plaintiff to incur expenses to determine if he or she has been physically injured, we find no reason why the expense of such an examination is any less a present injury compensable in a tort action than the medical expenses that might be incurred to treat an actual physical injury caused by such a breach of duty.

*Lewis*, 342 Ill. App. 3d at 101-02.

Precision argues that the medical monitoring claim in *Lewis* is distinguishable because that claim did not involve a demand, as here, for long-term medical monitoring of persons alleging no present injury. Precision reads *Lewis* too narrowly. The *Lewis* plaintiffs sought to compel the defendants to reimburse and pay the plaintiffs and the class members "for the costs of all medical screenings, assessments, and monitoring of their minor children." *Lewis*, 342 Ill. App. 3d at 99. The *Lewis* plaintiffs' allegations and the *Lewis* court's holding do not indicate that the costs of medical monitoring were sought only to detect a present physical injury.

11

A Federal Court in this district has also held that a claim for medical monitoring was cognizable in Illinois. *Carey*, 999 F. Supp. at 1119. Precision first argues that the *Carey* decision is of no weight because that court permitted an interlocutory appeal because the medical monitoring issue involved a controlling question of law as to which there was substantial ground for difference of opinion and an immediate appeal may materially advance the ultimate termination of the litigation, *see* 18 U.S.C. § 1292(b).[1] However, the recognition of the debatable nature of the issue does not diminish the precedential value of the *Carey* court's careful and persuasive analysis of the issue.

Precision also cites two decisions, subsequent to *Carey*, holding that medical monitoring claims were not cognizable under Michigan and Texas law. *See Henry v. Dow Chem. Co.*, 473 Mich. 63 (2005) (*Henry*); *Norwood v. Raytheon Co.*, 414 F. Supp. 2d 659 (W.D. Texas 2006) (*Norwood*). Both the *Henry* and *Norwood* courts emphasized that no court in Michigan or Texas had ever authorized a medical monitoring claim in the absence of a physical injury. *See Henry*, 473 Mich. at 80-83; *Norwood*, 414 F. Supp. 2d at 664. Here, both an Illinois appellate court and a federal court interpreting Illinois law have found that a medical monitoring claim is cognizable in Illinois. Furthermore, numerous other state and federal courts have recognized medical monitoring claims in the absence of a physical injury. *See, e.g., Allgood*, 2005 WL 2218371 at * 8 (Indiana); *Burns v. Jaquays Mining Corp.*, 156 Ariz. 375 (1987) (Arizona); *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965 (1993) (California); *Ayers v. Township of Jackson*, 106 N.J. 557 (1987 ) (New Jersey);

---

[1]The Seventh Circuit Court of Appeals declined to hear the appeal, and the case was later settled.

*Redland Soccer Club, Inc. v. Department of the Army*, 548 Pa. 178 (1997) (Pennsylvania); *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970 (1993) (Utah); *Bower v. Westinghouse Elec. Corp.*, 206 W. Va. 133 (1999) (West Virginia).

Lastly, Precision cites *Metro-North Commuter R.R. Co. v. Buckley*, 521 U.S. 424 (1997) (*Buckley*). That Court held that a plaintiff, who filed suit under the Federal Employers' Liability Act ("FELA"), was not entitled to a lump-sum payment of damages for medical monitoring after being exposed to asbestos-laden insulation. *Buckley*, 521 U.S. at 438-441. However, the broad remedy sought in *Buckley* is readily distinguishable to the remedy prayed for in the instant case. The *Buckley* plaintiff sought a lump-sum payment for "the *extra* monitoring costs, over and above those otherwise recommended . . . ." *Buckley*, 521 U.S. at 441 (emphasis in original). Furthermore, the Supreme Court in *Buckley*, after canvassing state law cases that had considered this issue, specifically limited its ruling to the matter before the Court. It did not "express any view . . . about the extent of which the FELA might, or might not, accommodate medical cost recovery rules more finely tailored than the rule [the Court] considered." *Buckley*, 521 U.S. at 444.

Based on the above, relief in the form of medical monitoring as sought by Plaintiffs is cognizable under Illinois law.

## CONCLUSION

For the foregoing reasons, Precision's Motion for Judgment Denying Plaintiffs' Claim for Medical Monitoring is denied.

Dated: May 26, 2006

JOHN W. DARRAH
United States District Court Judge

13